HAYNES *v.* BENNING W. SANBORN AND THOMAS W. SANBORN.

BROWN *v.* SAME.

Where a mortgagee of personal property attaches the property mortgaged, in an action for another debt due to him from the mortgagor, and after judgment satisfies his execution out of the property attached, he thereby waives his right to set up the mortgage against subsequent attaching creditors of the same property.

THESE cases were tried together by the court, by agreement of the parties.

The first is *assumpsit* on a promissory note, dated April 6, 1861, for $8,716.47, payable to the plaintiff, as deputy sheriff, or order, on demand, with interest, at any bank in Concord. Endorsed May 17, 1862, Received $6,935.98 ; April 15, 1862, Received $1,110. Endorsed C. B. Haynes, D. S.

Calvin Howe is the party in interest.

The second is *assumpsit* on a promissory note, dated April 6, 1861, for $3,168.09, payable to C. B. Haynes, Deputy Sheriff, or order, on demand, with interest, at any bank in Concord. Endorsed C. B. Haynes, Deputy Sheriff.

Brown & Young, John Brown and John A. Harris are the parties in interest.

On the general issue the facts appeared to be as follows :

In 1861, E. Jackson was in trade in Concord. He had two stores, one in Stickney's Block, called the upper store, and the other in Hill's Block, called the lower store. He was largely indebted to various parties, among others to Calvin Howe on notes, and Howe was endorser of other notes of Jackson to the Concord Savings Bank and to the Equitable Insurance Company. He was indebted to Benning W. Sanborn on notes, and said Sanborn was liable for Jackson as surety on various notes, and Jackson owed John Brown, Harris and others, to the amount of $30,000 or $40,000.

On the 2d of March, Howe and B. W. Sanborn, after consulting together, procured writs against Jackson in favor of Howe on his notes, on notes of the Concord Savings Bank, where Howe was surety, and in favor of B. W. Sanborn on all his claims then due. On the same day

they called on Jackson and he made to them a mortgage of all the goods in the upper store, and a mortgage to Peter Sanborn on all the goods in the lower store, to indemnify him against a note on which he was liable with Jackson. The mortgage to Howe and B. W. Sanborn was in favor of each to secure his separate claims and liabilities. They were not jointly liable. The mortgage secured the same claims mentioned in their writs and some others, not then due. On the 5th, Howe and B. W. Sanborn placed their writs in the hands of Haynes, as deputy sheriff, to make service, and directed him to attach all the goods in both stores, and he did so. Afterwards, on the same day, Harris, Brown and twenty or thirty others had writs made on their claims, which were placed in the hands of Haynes, with instructions to attach all the property of Jackson he could find. In the suits of other parties Howe and B. W. Sanborn were summoned as trustees.

All the goods in both stores were attached by Haynes on the 5th, on the writs of 1, Howe; 2, the Savings Bank; 3, B. W. Sanborn; 4, Harris; 5, Brown & Young, and 6, Brown; and then of others, each attachment being made subject to those previously made. Before this time some goods, not included in the mortgage to Howe and B. W. Sanborn, had been placed in the upper store, and were attached with the rest. In attaching the goods in both stores, no reference was had to either of the mortgages.

Subsequently the goods were sold upon the writs by the officer, on application of Jackson. The goods in the upper store were sold in one lot, and those in the lower store in another lot. Both lots were sold to Thomas W. Sanborn, son of Peter Sanborn, and nephew of B. W. Sanborn. Haynes received in payment for the goods the notes in suit, the large note for those in the upper store, the other for those in the lower store. They were given for the whole amount for which the goods were sold, without reference to the mortgage.

All the suits were entered in court, and, at February Term, 1862, judgments were rendered in favor of

| | | | |
|---|---|---|---|
| Howe, for debt, | $1105.67, | cost | $392.14 |
| Savings Bank, for debt, | 1079.10, | " | 7.08 |
| B. W. Sanborn, " | 6891.48, | " | 7.08 |
| J. A. Harris, " | 626.17, | " | 10.04 |
| Brown & Young, " | 953.71, | " | 13.07 |
| John Brown, " | 1000.00, | " | 8.07 |

Most of the other suits are still pending.

Executions were duly issued on these judgments, and delivered to Haynes, as deputy sheriff, to be levied on the property attached. Haynes made the levies on the 17th of March, 1862, first on the proceeds of the property in the upper store, on Howe's execution, then on the execution in favor of the Savings Bank, then on Sanborn's execution, and these, as he computes it, taking the debts and costs, exhaust that property. Then he levied on the proceeds of the lower stock the executions of Harris, Brown & Young, and Brown. Harris' execution was satis-

fied in part from other property, and these levies do not exhaust the lower stock. The balance is liable on other attachments, or on the mortgage to Peter Sanborn.

April 15, 1862, T. W. Sanborn paid to the Concord Savings Bank $1110, which was endorsed on the note in the Haynes suit, and May 17, 1862, the amount of B. W. Sanborn's execution, except the cost, was endorsed on the same note, and B. W. Sanborn receipted to the officer for the amount on the execution.

On the 4th of March, 1861, the day before the attachments were made, Jackson executed to Howe and B. W. Sanborn an assignment of his books generally to secure their claims and liabilities on his account, and it is claimed that Howe's note of $1000 has been paid by collections on the book accounts assigned to him and Sanborn.

Howe's execution not being settled, he called for payment, and Haynes endorsed to him the large note, to pay himself, and account for the balance to the officer.

After the levies were made, when Harris, Brown & Young, and Brown called on the officer, he endorsed to them the small note, to collect, and satisfy their claims, and account to him for the balance.

When the goods were sold by the sheriff, April 6th, 1861, at the date of the notes, B. W. Sanborn notified the sheriff that the goods must be sold under the mortgages, and a writing was made on the book containing the invoice of the goods, which was signed by the sheriff and Thomas W. Sanborn, as follows :

"The above stocks of goods were this day sold by Carr B. Haynes, Deputy Sheriff, to Thomas W. Sanborn as above, and payment has been made by two notes of this date, signed by Thomas W. Sanborn as principal, and B. W. Sanborn as surety, payable on demand, with interest, one for $8,716.47, the other for $3,168.09. It being understood that none of the rights of Peter Sanborn, Calvin Howe, or B. W. Sanborn, as mortgagees of said goods, are waived, or in any affected by said sale, and the giving of said notes.

C. B. HAYNES, <i>Dep. Shf.</i><br>T. W. SANBORN.

All the notes described in the condition of Jackson's mortgage to Howe and B. W. Sanborn were included in their judgments but two, namely, a note for $523.00, dated March 2, 1861, signed by Jackson, payable to Peter Sanborn, or order, on demand, with interest, endorsed in blank and then the property of B. W. Sanborn, (which note was not made till after the writs were made) ; the other, dated May 7, 1860, signed by Jackson as principal, and B. W. and P. Sanborn as sureties, for $2.100, payable to Samuel Butterfield, and not due at the date of the mortgage, which contained a condition to indemnify B. W. Sanborn as surety upon it. Said Sanborn has been required to pay, and has paid, this note.

Jackson and Peter Sanborn had been partners. On their dissolution, Jackson undertook to pay the debts of the firm, and gave Sanborn a note

dated April 14, 1857, for $500, to indemnify him against a note of the firm to J. H. Veazie for the same sum payable on demand with interest. This note was secured by the mortgage on the goods in the lower store. These notes, the defendants claim, should be satisfied out of the notes given for the proceeds of the mortgaged goods.

The sales, they contended, were subject to the mortgage, and the levies were on what was left. On the other side, it was contended that Peter Sanborn was an entire stranger to the actions, and no set-off could be made for his benefit; that B. W. Sanborn, though a party to the actions, was a mere surety, and the defendants could make no set-off or defence to the action on the ground alleged, and their remedy, if any, is against the officer.

*Minot & Mugridge* and *Fowler & Chandler*, for plaintiffs.

*Eastman & Cross*, for defendants.

PERLEY, C. J. The notes sued in this action were given on the sale of goods attached by the plaintiff Haynes in suits against Jackson; and Benning W. Sanborn resists payment of the balance, on the ground that part of the goods attached and sold was covered by a mortgage to him, and another part by a mortgage to Peter Sanborn; and he contends that the remainder of the money due on the notes should be applied on these mortgages, and not on the executions issued on the judgments recovered in the suits in which the goods were attached in mesne process.

The case shows that Howe, for himself and the Savings Bank, and Benning W. Sanborn brought suits against Jackson, delivered the writs to Haynes, the officer, and directed him to attach all the goods, and the attachments were made accordingly. Afterwards other creditors of Jackson attached the same goods subject to these prior attachments.

It is said in argument that Sanborn, inasmuch as his was not the first attachment, but second to Howe's, is not responsible for the original attachment and cannot therefore be held to have waived his claim under the mortgage by his attachment. But Howe and Sanborn, as the case shows, consulted together and had their writs made before they took their mortgage, and they had their mortgage made running to themselves jointly. So far they acted together on a mutual understanding, and the writs, which they procured together, were served by their direction before any other attachments were made. They went on with their suits and attachments, recovered judgments, delivered their executions to the officer who made the attachments, and had them satisfied out of the goods attached. The report of the facts found by the court states that *they* placed their writs in the hands of the officer and directed him to attach the goods. It is too plain for doubt or cavil that they united in all measures taken for their security before the attachment, and that the attachment was their joint and concurrent act.

In the first place, with regard to the mortgage of Benning W. Sanborn: He must be held to stand on the same footing as if he alone had

directed all the goods to be attached on his writ without regard to the mortgages, and thus to have voluntarily placed them in the control of the law and beyond his reach as mortgagee. The goods were sold on the writ under the statute. He went on with his suit, holding the goods, or the proceeds, under his attachment. He recovered judgment, took out execution, delivered it to the officer who held the proceeds of the goods under his attachment, and by his direction his execution was satisfied out of the goods which he had attached.

If Sanborn had a valid mortgage he might have asserted his title as mortgagee by taking and holding possession of the goods and disposing of them under his mortgage. But when he attached the mortgaged property he put it out of his power and control, and placed it in the custody of the law. He thereby made it liable to subsequent attachment by other creditors. While it thus remained, by his direction, on his ⸱ writ and process, in the hands of the officer and in the custody of the law, he could not interfere at all with the property as mortgagee. Nor could he make any complaint, nor maintain any suit against subsequent attaching creditors, nor against the officer who made the subsequent attachments; for it was the right of the creditors and the duty of the officer to make the subseqent attachments. It is quite plain that the two remedies by attachment and under the mortgage are inconsistent and cannot be pursued at the same time and together.

Where there are successive attachments of the same personal property the statute provides that it shall be held under the attachment for thirty days after judgments are recovered, and "shall be holden to the creditors in the order in which the attachments were made; and where, as in this case, the property attached has been sold on the writs before judgment, the provision of the statute is that the "proceeds shall be holden to pay the executions issuing in the actions in which the attachments were made, in the order in which they were made." Comp. Stats. 473, secs. 35 and 36.

In this case Sanborn held on to his security by attachment, delivered his execution to the officer, and satisfied his judgment out of the goods attached. The subsequent attaching creditors, by the express provision of the statute, had the right to insist that the proceeds of the goods attached should be applied to their executions according to the order in which the attachments were made, and it was the duty of the officer so to apply them. Such being the law which regulates the rights of creditors who have made successive attachments of the same property, we are of opinion that a mortgagee of personal property, who attaches the mortgaged property, pursues his attachment to judgment and execution, and satisfies his judgment out of the property attached, has waived his right to insist on the mortgage against subsequent attaching creditors, who have recovered judgment and seasonably placed their executions in the hands of the officer, to be levied on the property attached.

It is not easy to perceive what interest T. W. Sanborn, the purchaser of the goods, could have in the application of the proceeds. The subsequent attaching creditors were not parties to the writing signed by

him and the officer, and it is quite plain that their rights cannot be affected by it.

With respect to Peter Sanborn's mortgage, the case stands on different grounds. He has directed no attachment, but, on the other hand, he is not party to this suit, nor to the note. He is not here making any claim, nor does it appear that he has made any on the officer. If he had made such a claim, the officer, having endorsed the note to Brown, the plaintiff, cannot object that it should be paid to the endorsee according to his order. If Peter Sanborn knew of these attachments and assented to them, he would probably be held to have waived his mortgage as much as if he had directed the attachment himself.

*Judgment for the plaintiffs on both notes for the balance unpaid.*